HICKS *et al. v.* STATE.

*(Nashville,* December Term, 1949.)

Opinion filed July 15, 1950.

HARVEY E. TAYLOR and MAX BRESLER, both of Memphis, for Hicks.

HUGH STANTON, of Memphis, for Lee.

NAT TIPTON, Assistant Attorney General, for the State.

MR. JUSTICE PREWITT delivered the opinion of the Court.

Defendants, Sam Hicks and Clarence Lee, were convicted of subornation of perjury under Section 11072 of the Code. The punishment of Hicks was fixed at imprisonment in the penitentiary for not more than five years, and that of Lee was fixed for not more than three years. They have appealed to this Court and assigned errors.

Defendant Hicks was the operator of a Negro restaurant in North Memphis known as the Little Peabody. It had an adjoining room known as the Blue Room, in which Negroes of that vicinity congregated and drank beer. Lee, the other defendant, was in and about this place quite often.

In June 1949, Carrie Mae Henry, a Negro girl related to Hicks, was stabbed to death in the Little Peabody, not in the Blue Room but in another portion of it. The State's witness White testified that defendants were the

only two persons in the part of the restaurant where this woman was killed at the time.

For some reason not shown by the record, Hicks undertook to try to lay this killing on White. White and deceased seem to have been going together for some time and to have had a quarrel about three or four days before the killing. A police officer of the Homicide Department of the Sheriff's Office, who investigated the case, testified that Hicks furnished him with the names of certain witnesses whom he claimed knew something about the killing. These included Edward Brown, the party alleged to have been suborned in the present case, two Anderson girls, and a Negro named Jones. This officer further testified that he knew of no witnesses except those furnished him by Hicks.

Since the indictment charges that Brown was suborned to give testimony, we here quote his testimony in this respect as follows:

"Q. Why did you tell this story, Edward? A. Sam Hicks and Clarence Lee came out to my house, 1732 Warford, and they spoke to me—wait, let me tell it right. I was laying across the bed, and my wife waked me up and told me that Sam Hicks was out there, and wanted to see me. I got up and slipped on my shoes and went out there to the car, and Clarence Lee was sitting right there next to the glass, and Sam was sitting right beside him.

"Q. Are those the two defendants, sitting back there? A. That is them right there; that is right. Then Sam spoke up and he said, 'Brown, you were down at the Little Peabody when Carrie Mae got killed, weren't you?' and I said, 'I sure was, I was in the Blue Room.'

"Q. Talk a little louder, Edward. A. I said I was in the Blue Room, and he said, 'Yes, you ain't never been in no court room down at the Court,' and I said, 'No, I have not,' because I have never been in no court, never been arrested or nothing, and he said, 'Well, come down here so we can tell you what to say. You know you have got to be a witness.' I told him, 'No, I guess not,' and he told me that I did see her dying, and that I did see this, and he said, 'That is the reason me and Clarence come here, so we can tell you, so you will know what to tell the people when you go up there,' and I didn't know no better; I didn't know nothing, and I said, 'O.K., I am going to tell the truth,' so he said, 'O.K., Clarence,' and Clarence said, 'When you go down there,' he said, 'You tell them that you were seated at a table about two or three feet from the counter, and heard some curse noise, and when you heard the curse noise, you got up to see what it was, and you saw this boy with a butcher knife, pressing right into the girl, holding her by her left arm with his left hand, with a butcher knife in his right hand,' and I said, 'Look,' I said, 'I ain't seen nothing like that.' And he said, 'That is court; that is what you have got to say. That is what we have come to see you for, to tell you what to say,' and so I sat up there, and Lee stood up, and Lee said—that is Clarence Lee, he said, 'You say that you seen him when he got off of the girl with the knife in his hand, come around the corner and through the little hallway, and he shifted the knife from this hand into this hand, like this (illustrating) and all of you so and so's—'

"Q. Go ahead, and state what Lee said. A. 'All you sons-of-bitches get back and let me come out of here, and he went out the door.' Then he said, 'Now what

are you going to say,' he said, 'They will ask you which way did he go when he went out the door? and you tell them that you don't know.'

"Q. Well, what, if anything, was said about beer, or anything to drink? A. Sure, Sam—Clarence is the one that told me about the beer, he said, 'You were drinking a quart of beer,' and he told me how to say it, and I said, 'I was drinking a quart of beer.' "

The two Anderson girls testified that Hicks came to their home and asked them to go to the law and make a statement for him that they had seen White kill deceased. Jones testified that Hicks came to where he lived and asked him to go to the authorities and tell them that he had heard White make a threat to kill deceased.

The record shows that the investigating officers took signed statements from all these witnesses; that White's case was called for trial, and that Brown, the two Anderson girls, and Jones were placed upon the witness stand and testified to the facts as Hicks had undertaken to get them to testify; that later in the trial the District Attorney General became suspicious of the case, and upon investigation, these witnesses recanted their testimony; that he immediately put them back upon the witness stand to recant their testimony, and that a mistrial was entered.

By the witness Davis it was shown (corroborating Brown's testimony that he perjured himself) that Brown was in this Blue Room at the time the girl was killed and could not have seen the killing as he testified, and by White (the party originally accused of the killing) it was shown that he had left the scene of the killing before it occurred.

Only Hicks testified in his own behalf and definitely denied soliciting Brown, Jones, or the Anderson girls to testify.

██ It is insisted that there is no corroboration of the testimony of Brown, and that this is necessary for conviction. This insistence is made especially in behalf of Lee, as the evidence against Lee comes alone from the testimony of Brown. It is the rule that in perjury cases there must be corroboration, but this rule does not apply to false testimony which was procured or introduced by the party charged therewith. Annotation in 56 A. L. R. 407.

██ Subornation of perjury consists of two essential elements: (1) There must be the procuring of one of false swearing by another, and (2) the persons so solicited must actually swear falsely to a material matter. So far as the perjury itself is concerned, it is established by the testimony of White and the Davis woman, that Brown did not see White slay deceased. Corroboration is not required to procuring testimony, but only to the perjured nature of the testimony. Wigmore on Evidence, 3d Ed., Vol. 7, Section 2042, p. 281.

██ It is insisted by counsel for defendants that the indictment is duplicitous in that it undertakes to charge two persons with jointly suborning the commission of perjury, and they rely upon *State* v. *Wilson,* 115 Tenn. 725, 91 S. W. 195. In that case there was an indictment of two persons for perjury, and this Court held that the act of each was but a separate act, and that perjury was a crime to be committed only by the individual swearing. There is no sound reason why two persons might not seek and procure another to perjure himself. In the present case, the testimony of Brown definitely shows a

community interest or purpose between the two defendants to procure Brown to testify falsely. Any number of persons might jointly solicit one to perjure himself, and when the perjury was complete, it would be the joint crime of all rather than the individual crime of each.

It is also insisted by counsel for defendants that it was error for the trial court to admit in evidence instances of cases where Hicks had sought others to perjure themselves upon this same trial. The rule is that similar offenses are definitely admissible as showing both intent and a common purpose. Wigmore on Evidence, 3d Ed., Vol. 2, Section 342, p. 246.

We have carefully considered all assignments of error and find them without merit. The judgment of the lower court is, therefore, affirmed.

All concur.